Judse Nicholas,
dissenting from the decision of the majority of the court, upon the main question, read the following Opinion and argument.
The act of 1798, 1 Dig. 513, directs writs of fieri facias to be levied on, and the money made by sale of the debt- or’s “ lands, tenements and hereditaments, in possession, reversion or remainder.” The eighth section of the same act directs the sheriff to convey the land sold under execution, to the purchaser, and declares, “ his deed shall be effectual for passing to the purchaser all the estate and *218 interest which the debtor had, and might lawfully part-with, in the lands.”
The act of February, 1828, concerning executions, contains no clause expressly subjecting lands to sale under execution, or explaining the effect of a sheriff’s sale and conveyance ; though the whole tenor of the act recog-nises that they are still so liable to-be sold and conveyed. The repealing clause refers only to such previous acts as come within its purview. So that in ascertaining what estate in lands- is now subject to execution, and the effect of the sheriff’s' deed thereon, we are still to look to the above recited clauses of the act of 1798, as constituting a portion of the subsisting statutory law on this subject, except so far as they may be repugnant to, and unavoidably conflict with, the letter or some implication necessarily deducible from the act of 1828.
In the case of McConnell vs. Brown, 5 Mon. 480, it was determined, that the lands of a defendant, were not liable to execution, whilst in the adverse possession of another, under the act of 1798. This determination af-terwards came under the review of my brethren and my immediate predecessor, in the case of Shepard vs. McIntire, 4 J. J. Mar. 112; and it was unanimously held, that “ the- decision is not more authoritative, than its doctrine is just and reasonable. It is conformable to the letter of the statute, and seems to be perfectly consistent with its object and spirit.” The general impolicy of subjecting land so situated to execution, is there descanted upon much at large, and it is there satisfactorily shewn, how unreasonable and improper it would be, in the absence of express declaration, to presume the legislature intended to subject land so situated. Nothing further, therefore, need be said by me, on that head. Wc are agreed that any such intention must be clearly expressed : it is néver to be presumed.
The thirty fifth section of the act of 1828, points out the manner in which property levied on, may be released, by the surrender of other property, with a proviso,, that such surrender shall not delay the sale, and then follows an additional proviso, in the same section, which is worded and punctuated literally as follows : u Provided *219 juriker, That nothing in this act contained shall authorize a Constable to make sale of land, or to authorize a surrender of land to a Constable in lieu of other property — all legal title to real estate shall be liable to sale by execution, whether in actual possession, er not.”.*
It is thought that the latter clause of this proviso is a substantive, distinct enactment, and should be treated as if if constituted a separate section of itself. Such is not properly the province of a proviso. It is generally used for the purpose of qualifying or restraining, in some excepted particular,-a previous grant or direction. Treated in this way, there is no sense to be made out of it, for there is nothing in the previous part of the act to be thus limited. But if we must sever the latter clause from the proviso altogether, and treat it as a separate, distinct, enacting sentence, the question then is, whether it necessarily requires that we should so construe it as to subject to execution lands held in adversary possession.
It will be recollected, as a general rule of construction, “ that a statute which alters the common law, or the law as it stood aforetime, shall not be strained beyond the words, except in cases of public utility, where the end and design of the act appear to be larger than the words *220 themselves.” That there is no public utility, or matter of general policy, to be achieved by strainiiig the words here, so as to make them come up to the result conte'nd-et^ ^01’’ must taken as a concession in this argument. That the construction attempted to be put upon the words in question, is necessary to their harmonizing with other parts of the act, is not pretended. That it would be in opposition to the spirit and general character of the rest of the act, and of other laws, is susceptible of easy proof.
In maintaining the construction which was put upon-the act of 1793, with regard to this subject, my brethren in the case of Shepard vs. J\fcFntire, very properly laid much and earnest stress upon the favor shewn to real estate by the legislature, in exempting it from execution until all the personal estate and slaves were exhausted ; and inasmuch as slaves and personalty adversarily held, were not made liable to execution, thence inferred the absence of all intention on the part of the legislature, to subject land whilst in adversary possession. This argument still applies with accumulated energy here. For there is not only all the same partiality manifested, by the act of 1828, in favor of land, and still the same failure to subject personalty, or slaves, whilst held adversely; but other, additional, and much more effective, guards are placed around land, to prevent its premature sale, or sacrifice, and such as were wholly unknown to the act of ’98. Under the latter act, land was sold unconditionally and irredeemably, for whatever it would bring under the hammer ; whilst under that of 1828, it must be valued, and if not sold for two thirds of its value, •the purchaser acquires only a defeasible estate, liable to redemption at any time in twelve months. Besides if the title to land adversarily held, can be sold at all under execution, it cannot be denied, that the title must be first valued. Now, can it be presumed that the legislature contemplated the ridiculous farce of the sheriff’s ascertaining, by the opinion of two plain farmers, the relative goodness or superiority of two land titles ? For upon ascertaining that, intrinsically depends the money value which they are bound to put upon the title about *221 to be sold. There is no question of which, in the general, they would be less competent to judge ; for there is none of more difficulty to those who are best versed in the law, even after the facts upon which its solution depends, are fully ascertained. Without their ascertain-riient, and which is what no appraisers can ever be expected to do, it lies not within mortal'ken, to approximate, even by a guess, the true value of any title offered for sale.
But say that, from the impracticability of the thing, the right so held, is not to be valued, and it may be sold without valuation : can we suppose the legislature capable of such gross injustice, as to wantonly sacrifice such an interest, by sale under execution, when they have taken from the unfortunate debtor all power of selling it himself, and for the mere effort to do so, they forfeit his estate P I say wanton sacrifice, — for what else would it be ? We find it sufficiently difficult to procure any thing like a fair price for land, when sold under execution, with all the guards that can be thrown round the purchaser, and all the enoouragment that is extended to him. Wlia't honest, worthy citizen wants to buy an adverse title to land, over his neighbor’s head ? What citizen of that description will buy, at any price, a law suit against his neighbor ? it evil! infallihly be found to be a vendible commodity with none but champertors, land-jobbers and peculators. I cannot consent to convict the legislature of an intention to sacrifice an unfortunate debtor’s property, with the view to favor any such class of the community. The execution law of 1828 was intended as a permanent part of our code, and may endure for centuries. I cannot bnt feel alarmed for the consequences, if we now put upon it a construction to authorize the sacrifice of a debtor’s property whilst in adversary possession. I cannot but dread its operation upon the interests of infants, of the destitute and unfriended of all-classes. Disseizors, abators and intruders, by their iniquity in withholding all such from their property, many times produce the inability of paying debts, and they will thus be enabled, without competition, to consummate the injury by buying in the title for a mere trifle. One wpuld naturally presume, that if the legislature in *222 tended to engraft so deleterious a principle upon our code, (hat they would do it in the plainest and least am-biguons terms. It seems to me, that sheer justice and comity require, that we should be able to find such language before we attempt to convict the legislature of any such intention. With this understanding, let us proceed to the investigation of the true import of the language used, and see whether it necessarily compels us to adopt the construction contended for.
All legal title to real estate shall be liable to sale by execution, whether in actual possession-, or not.” According to the strict grammatical construction of this sentence, it is the legul title, and not the real estate, which is made liable to execution; and consequently, it is the title, and not the land that is referred to, and made liable to sale, whether in actual possession, or not. And here I might rest the discussion, and require of those who wish to use this sentence for any purpose, to do it with this construction upon it. It is, however, so impossible to imagine what could have been meant by a legal title being in actual possession, or not, that though this is the grammatical construction, yet we must not treat it as the true meaning of the words used. If this be admitted, candor, at the same time, requires a similar concession from the other side ; that the terms, whether in actual possession, or not, mean nothing more, literally, than, whether in actual, or constructive, possession, and that the full sense of those words is couched in the latter paraphrase. The distinction between actual and constructive possession of land, is well ascertained and defined, and of familiar use in legal parlance. They are most generally used in contra-di-.tinction to each other; and such a phrase, as here used, must properly beso construed, unless there be something else to control the words into a different construction. I do not understand my brethren as controverting all this. But, say they, if we construe the legislature to mean actual, or constructive, possession merely, as the one stands in contradistinction to the other, and nothing more, then the language used is of none effect, for such would have been the law though no such words had been used. Thence they deduce the right and necessity of construing the *223 words beyond their literal and natural import, and ltiak-ing them mean, ‘whether in the actual possession of the defendant, or in the adversary possession of another.’ In answer to this, I beg to be informed, whether this is the first instance, by many thousand, in which the legislature has been guilty of the venial offence of using unnecessary expletives, redundant words, or even inoperative clauses and sections, which are merely in affirmance of xvliat the law would have been without them ? What else than some such matter, could be expected to have been so awkwardly introduced at the tail of a proviso ?
If the legislature had intended what is now contended for, would they not, most probably, have thought the introduction of so novel and important a principle into our code, worthy of a distinct, separate section ? and would not their intention have been announced in much less ambiguous language ? Would they not have expressly said, though held in adversary possession, and not left such intention to be gathered by mere implication ? It seems to me they would, at least, have used the much more appropriate language, whether in possession, or not, omitting the word actual. This idea is much fortified by the language used in the thirty fourth section, in prescribing the affidavit necessary for a defendant to make, before he could send an execution after land in another county, requiring him to state, “ that the land is not in the adversary possession of another;” thus manifesting that they were well aware of what was the appropriate language,when they intended to convey that idea.
Another argument against the construction contended for, and which is based upon implication merely, is that there is no necessity for it. For we are agreed, that the thirty seventh and thirty eighth sections of the act enable the creditor to subject the right of his debtor to land in the adversary possession of another, to the payment of his debt, by bill in chancery. This strips from my associates, the whole pith of the argument of the dissen-tient judge in McConnell vs. Brown. The legislature having, in the same act, devised another, and so much more appropriate remedy to the creditor, supersedes all necessity for giving him this so inappropriate one, by impli *224 cation merely. In the one way, the relative merits of the adversary titles will be investigated, and finally set-tied, and the property, when exposed to sale, thereby enabled to produce the highest possible price; whereas, the other leads to absolute and inevitable sacrifice.
But it is said, there was a rumour in the land, about the time of the passage of the act of 1828, that the clause in question, was introduced for the purpose of meeting and overruling the then recent decision of McConnell vs. Broion. Such rumour never reached me. I have a right to believe that it had not reached this court twelve months ago. For at the spring term 1832, in the case of Shropshires vs. Morgan &c. we certainly did decide, though incidentally, and without discussion, yet expressly, that land in adversary possession, could not be sold under execution. But rumor or not, I feel it my duty to look to the language of the act exclusively, in ascertaining legislative intention. I doubt whether a tenth of the members of the legislature had seen or heard of the case of McConnell and Brown, then not reported. If they had, and intended to overrule it, I cannot doubt but that language much more explicit and adequate would have been used.
But what, to my mind, is an unanswerable objection to the construction contended for, is, that it will virtually repeal the champerty act of 1824. It presents a facile mode by which the wholsome provisions of that act against the vending of title to land whilst in adversary possession, may be successfully evaded. It would be a most liberal stretch of judicial power, to sajq that when such a thing is proved to have been done for the purpose of evasion, we will still bring the transaction within the denunciation of the act of 1824. I am not prepared to say that I will not go that length; for such is my conviction of the sound policy of that act, that I shall be ready at all times to go as far as a judge ought, in sustaining it in vigorous, or even rigorous, operation. But may it not hereafter be plausibly urged, that inasmuch as the posterior act of 1828, authorized such sale under execution, that it" must, for every purpose, be considered a pro tanto revocation of the act of 1824, and that the mere *225 assent of the defendant in the execution, that his title may be so sold, with, a concurrent understanding that another is to purchase, in this mode allowed by the law itself, can never be properly construed into a fraud upon the law. Be this, however, as it may, there is no doubt such arrangement must be clearly proved, and this, if the parties choose to deny it, there will, many times, be no means of doing. The result, then, in either case, must be a partial repeal of the act of 1824. it seems to me to be an abuse of all rules of construction, to suppose that the legislature meant, by this ill constructed half sentence, so awkwardly smuggled in at the tail of a proviso, to repeal any part of such a law as that of 1824,

 The manner of pointing the proviso appears to have been attended to by the learned judge, and to have had some influence upon his mind, while construing the clause under consideration.— The quotation is made, and printed in the text, exactly as it stands in the only printed copy of the law extant — the Session Acts of 1827-8. — But the acts of that session, and particularly the execution law, are very inaccurately printed ; and the passage quoted, as punctuated in that volume, varies from the enrolled act, in the secretary’s office ; where it stands in the following form :—
“ Provided further that nothing in this act contained shall au-thorise a Constable to make sale of land or to authorise a surrender of land to a Constable in lieu of other property. All legal title to real estate shall be liable to sale by Execution Whether in actual possession or not.”
Here, as in the roll, it will be observed, that the clause which the majority of the court have determined is a separate enactment, stands as an independent sentence — not connected with the proviso by a dash, followed by a small letter, as in the printed copy.
There are other errors in the printing of the same act, of much greater magnitude : for instance, the obscurity, or rather the nonsense, which may be observed about the middle of the twenty third section, is caused by leaving out fifteen words, in one place, and changing one, in another.